UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON

*Eastern District of Kentucky*
**FILED**

MAR 3 1 2006

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 03-79-DLB

MAYSVILLE ANESTHESIA
SERVICES P.S.C., ET AL.                                          PLAINTIFFS

vs.                              OPINION & ORDER

MEADOWVIEW REGIONAL
MEDICAL CENTER, LLC, ET AL.                                      DEFENDANTS

*****************************

This is a diversity action based upon an alleged breach of contract, with various tort

claims related thereto.   The case is before the Court on several dispositive motions;

namely, Defendant Meadowview Regional Medical Center, LLC's Motion for Summary

Judgment (Doc. #37); Defendant Allan Risenmay's Motion for Summary Judgment (Doc.

#39); Plaintiffs' Motion for Partial Summary Judgment against Defendant Meadowview

(Doc. #40); and Plaintiffs' Motion for Partial Summary Judgment against Defendant

Risenmay (Doc. #41).

**Factual Background**

At its core, this case is about business relationships gone bad.   The issue for the

Court is whether any of the claims arising out of those relationships are actionable.

Plaintiff Lloyd A. Manchikes, M.D. ("Manchikes") is a board-certified

anesthesiologist.   In the Fall of 1998, Manchikes applied for a position with Defendant

Meadowview Regional Medical Center, LLC ("Meadowview").   Manchikes is a recovering

alcoholic. He has participated in the impaired physicians' program run by the state medical

board. His status as a physician with the condition of alcoholism, in remission, was disclosed in the course of his being hired on at Meadowview. Shortly before Manchikes was scheduled to begin employment at Meadowview, he experienced a setback and was hospitalized for a drug overdose. He was at that time diagnosed with endogenous depression for which he received medication prescribed by a psychiatrist.

In 1999, while Manchikes was working at Meadowview, he approached then-hospital administrator Curtis Courtney about the possibility of forming his own corporation and privatizing the hospital's anesthesia services. Prior to his employment at Meadowview, Manchikes had previously been the sole shareholder of a professional services corporation. Discussions between Meadowview and Manchikes ensued, ultimately culminating in a one-year professional services agreement ("PSA") for anesthesiology services at Meadowview to be provided by Plaintiff Maysville Anesthesia Services, P.S.C. ("MAS") beginning January 1, 2000.

MAS was incorporated in July of 1999 as a Kentucky professional services corporation to operate as a provider of anesthesia services, specifically to Meadowview. Manchikes was the incorporator, the corporation's sole shareholder and its president. The corporate secretary/treasurer was Defendant Allan Risenmay. Risenmay is a certified registered nurse anesthetist ("CRNA") who had been employed with Meadowview since approximately 1991. Both he and Manchikes left their employments with Meadowview in 1999 to work for MAS.

When privatization discussions began, Courtney contacted Garland Barr of Merrick Management, a professional management company for anesthesiology provider groups. Barr met with Courtney, Manchikes, and Risenmay to gather information for a profit

2

projection and to assess the soundness of the anesthesiology services being outsourced from the hospital exclusively to MAS. Attorney Henry Richmond was retained to provide legal services in forming the professional services corporation. Meadowview acknowledges that, as a professional courtesy, it paid one-half of Richmond's fee for legal services. Richmond also researched the issue of whether then-Kentucky law permitted a physician and a CRNA to partner for the purpose of forming a professional services corporation. Attorney Richmond thereafter offered advice on the formation of MAS and for Manchikes to serve as the sole shareholder, and prepared the necessary documents to set up MAS. According to Manchikes, Courtney told him this outsource arrangement would result in a significant financial benefit to him, while still permitting Manchikes to practice at Meadowview. Manchikes maintains that he was induced to resign his position at Meadowview and to undertake this new contractual relationship with the hospital based upon these representations by Courtney as CEO of Meadowview.

Manchikes contends Meadowview was motivated to press for this arrangement because it allowed them to avoid potential liabilities if he remained on the staff at the hospital. As Manchikes describes it, Meadowview was faced with a number of Americans with Disabilities Act issues with his continued employment, and an involuntary termination of his employment by the hospital would likely have also resulted in actions against Meadowview. Manchikes believes Meadowview intended to eliminate this problem by forcing him to partner with Risenmay at MAS and provide professional services via outsourcing.

3

How or why Risenmay came to leave Meadowview and take up employment with MAS is not entirely clear from the record.[1]  Plaintiffs' theory is that Meadowview forced him to take on Risenmay as a condition of privatizing the services.  Plaintiffs theorize that Meadowview had a particular motivation and interest in protecting Risenmay and his employment because Risenmay had previously offered testimony on behalf of the hospital in a civil lawsuit filed by a former employee.  Meadowview, on the other hand, submits that Risenmay being employed with MAS was simply a suggestion to further a mutually beneficial arrangement because procuring qualified anesthesiology services in the local area was not an easy task.  Under the MAS-Meadowview contract, MAS was to provide anesthesia services for the hospital's three operating rooms.  Having Risenmay as a full-time employee under contract with MAS facilitated its ability to fulfill its contractual obligations, while providing some assurance to Meadowview that their professional service needs would be covered.

Manchikes claims Meadowview management insisted upon certain terms in the corporate and contractual arrangement for the benefit of Risenmay.  Specifically, that Risenmay have phantom stock in MAS equal to his; that Risenmay be appointed as an MAS officer; that Risenmay's compensation be equal to his, which was double what Risenmay had been receiving at Meadowview; that Risenmay could not be removed as an employee for any reason, essentially guaranteeing him employment; and that Risenmay be given sole authority to buy out Manchikes.  According to Manchikes, during the time

---

[1]Risenmay has not been deposed.  According to the record, he now resides in Oregon.  Since the filing of this action, he has been diagnosed with a serious illness that has resulted in memory loss and a seizure disorder, rendering him unable to actively participate in these proceedings.  He is no longer able to work as a CRNA.

period MAS was being incorporated, Courtney had a number of meetings with Attorney Richmond about Risenmay's role in the arrangement.  Manchikes says he was not involved in these meetings, the result of which were the documents requiring Manchikes provide Risenmay with an option to purchase MAS shares should certain conditions occur.  One of these conditions was if the law should change and Risenmay were legally able to do so pursuant to Kentucky Revised Statutes Chapter 274 and the various licensing regulations, then Risenmay could at his sole election exercise the option to purchase the shares.

In any event, Risenmay did serve as a corporate officer and employee.  He was not a shareholder.  However, at the time he commenced employment with MAS, both he and Manchikes signed employment contracts with MAS in December, 1999.  These contracts were prepared by Attorney Richmond.  They provided for the two of them to be paid based upon net proceeds brought in by each to the corporation.  They were also to share profits received from other CRNAs that MAS employed.  In addition to the employment agreement, Risenmay was provided with an option agreement that gave him the option of purchasing fifty percent of the shares of MAS should certain circumstances occur.

The parties thereafter pressed on with their outsource business arrangement throughout 2000, Meadowview with MAS for anesthesia services, and Risenmay and Manchikes with MAS for professional employment services.  Although the business arrangement seemed to flow fairly well during 2000, there were a few bumps in the road.  Apparently there was at least one occasion where MAS was unable to provide anesthesiology coverage for all three operating rooms.  MAS was experiencing difficulties

5

in finding and hiring quality CRNAs, sometimes turning to temporary agencies for such *locum tenens*[2] at a premium cost to MAS.

In addition, personal and professional issues began to surface between Manchikes and Risenmay. Some of those tensions stemmed from differences in management philosophy. Risenmay asserts Manchikes began making corporate decisions without discussing them with him. Money and compensation issues also arose. MAS had increased overhead cost with the use of *locum tenens*. And in addition to rendering anesthesiology services, Manchikes also provided critical care services, though these services were reimbursed at a lower rate than the anesthesiology services, and consequent friction in the compensation sums being paid to Manchikes and Risenmay and the differences in those pay figures.

The 2000 MAS-Meadowview services contract expired at year end. According to Meadowview, Courtney tried to arrange a meeting with Manchikes to discuss an agreement for 2001. After Courtney unsuccessfully attempted to arrange a meeting several times with Manchikes, he met with Risenmay in order to discuss MAS as well as the rumor that Risenmay was looking for other employment.

Ultimately Meadowview and MAS renewed their professional service agreement for 2001 by letter, and the parties pressed on with their obligations, though relationships between the parties continued to deteriorate. Meadowview notes there were problems during 2001 with MAS meeting its service obligations under the 2001 contract. MAS was continuing to use CRNAs from staffing services. In April of 2001 Manchikes and Risenmay

---

[2]Locum tenens is a Latin phrase that means "to hold the place of, to substitute for." In layman's terms, it means a temporary physician.

ran into each other at the YMCA and started discussing MAS. Risenmay voiced his displeasure at the cost of *locum tenens* and voiced that he wanted his own corporation. At around this same time period, Manchikes had approached Meadowview seeking financial assistance for MAS and him personally; the hospital offered assistance to MAS only. Risenmay complains he was not involved in these discussions with the hospital about money.

In mid-2001 MAS notified Meadowview it would no longer be able to cover the third operating room until it was able to find a full-time CRNA. Meadowview, in turn, notified MAS that if it failed to provide these services, it would view such conduct as a breach of their agreement. MAS continued to service all three operating rooms.

In September of 2001 Manchikes presented Risenmay with a new employment contract. At that time Risenmay was still employed with MAS under an agreement for 2001. The new contract presented by Manchikes provided that Risenmay would no longer be an officer or director of MAS, would continue working for MAS as a salaried employee and his compensation would be reduced from its then-present rate. Risenmay asserts he was told to sign the new employment contract or be fired, though his then-current contract provided that he could not be terminated absent particular conditions. Risenmay later signed the agreement, though he did not resign his corporate officer position or terminate his option agreement. However, he claims Manchikes no longer treated him as a member of the corporation. Risenmay apparently also met with David Loving in this time period to inquire about his status with Meadowview if the contract between Meadowview and MAS was not renewed. Loving instructed Risenmay to discuss the matter with Manchikes.

7

In late 2001 Manchikes and the new hospital administrator, David Loving, started negotiations for a 2002 professional anesthesiology services contract. Manchikes apparently indicated he was resigning from MAS effective January 1, 2002, but during 2002 would continue providing anesthesia services under the name Maysville Anesthesiologists and Critical Care Services (MACCS). In mid-October, 2001, Manchikes signed a new contract with Meadowview for 2002, but later stated he was rescinding his resignation. In December, 2001 he signed a new one-year professional services contract with Meadowview. This contract was executed by Manchikes in his capacity as president of MACCS.

Meanwhile, the continued staffing and coverage problems continued into 2002. Manchikes once again approached Meadowview about providing financial assistance. Risenmay met with David Loving on two additional occasions to voice professional complaints against Manchikes. Risenmay maintains these complaints did not relate to either his contract with MAS or the Meadowview-MAS contract. Manchikes contends Meadowview management and Risenmay were meeting to discuss ways to procure his resignation from MAS so that Risenmay could exercise his option to purchase the corporate shares.

Moreover, the rapport between Risenmay and Manchikes continued to deteriorate. Manchikes claims that while at MAS he received verbal attacks upon his character, sobriety, sanity, and professional deportment. In November of 2001 MAS, via Manchikes, hired CRNA Vickie Abbott. Abbott testified that between November, 2001 and February, 2002 she overheard Risenmay state that Manchikes was "crazy," "did not know what he

8

was doing," and that he "hated him." The only specific instance she was able to recall occurred on March 1, 2002, following an argument between Risenmay and Manchikes.

Manchikes alleged other instances of conduct by Defendants attacking his character. Specifically, an incident where the administrator remarked that Manchikes was "one drink away from being a drunk." Manchikes also challenges a rumor within the hospital that he had to be hospitalized in Lexington and placed on a ventilator because he had abused drugs or alcohol.

In addition to the argument between Manchikes and Risenmay on March 1, 2002, this was also the date Risenmay signed a document ending his option agreement, resigning as an officer and director of MAS, and resigning from his employment with MAS effective 90 days post-signature. Manchikes also signed this document. Risenmay stayed at MAS through April of 2002, then took the month of May as vacation until he started a new employment position in Oregon.

The services contracts between Meadowview and MAS, including the 2002 contract, provided generally that the contract covered a one-year term, though either party had the ability to terminate the agreement upon 90 days notice to the other. On March 15, 2002, Meadowview notified MAS it was giving the contractually-required termination notice, and that the professional services arrangement between them would expire 90 days thereafter, per the contract. On March 17, 2002, Manchikes notified Meadowview that he was ending his employment with MAS.

As of September, 2003 MAS had changed its corporate name to Maysville Anesthesiology, Critical Care & Consulting, Inc. Manchikes subsequently became employed in 2004 with Anesthesia Medical Services in Owensboro, Kentucky.

9

## Procedural Background

Plaintiffs Manchikes and MAS filed suit against Defendants Meadowview and Risenmay on March 20, 2003, in the Mason County, Kentucky, Circuit Court. Defendants subsequently removed the action to this Court based upon diversity subject matter jurisdiction. Plaintiffs asserted claims for breach of contract based in part upon Meadowview's alleged interference with the internal affairs of MAS and Meadowview's failure to act in good faith; tortious and fraudulent inducement to enter into and interference with contract based upon the circumstances leading up to the creation of MAS; defamation and injurious falsehood based upon statements allegedly made by Defendants disparaging and casting doubt upon the quality of MAS; conspiracy between Defendants to cause injury to MAS and to him; breach of fiduciary duty by Risenmay to MAS to conduct affairs to the benefit of the corporation, allegedly breached by the conspiracy and meetings between the Defendants; and for punitive damages based upon Defendants' actions.

In its Amended Answer, Defendant Meadowview asserted a Counterclaim seeking a declaratory judgment against Plaintiff MAS that Meadowview lawfully terminated the professional services agreement between them effective June 23, 2002. Defendant Risenmay also asserted a Counterclaim against both Plaintiffs for claims of tortious and fraudulent termination of his existing employment agreement; tortious and fraudulent inducement for him to enter into a new employment contract; breach of contract for Plaintiffs' failure to pay for services and additional forms of compensation under his original employment contract; defamation based upon alleged false and misleading statements about him; intentional infliction of emotional distress based upon Manchikes' conduct toward him; and breach of fiduciary duty by Manchikes as the principal of MAS.

10

The parties are before the Court on various summary judgment motions. Defendant Meadowview seeks summary judgment on its counterclaim for declaratory judgment, as well as summary judgment in its favor on each of the five claims Plaintiffs assert against it. Defendant Risenmay also seeks summary judgment on the four claims Plaintiffs assert against him. Finally, Plaintiffs move for partial summary judgment on liability against Meadowview on Plaintiffs' breach of contract, inducement and interference, and defamation claims, and a dismissal of Meadowview's counterclaim for declaratory judgment. Lastly, Plaintiffs move for partial summary judgment on liability against Risenmay on Plaintiffs' breach of fiduciary duty claim, and summary judgment in its favor on Risenmay's Counterclaim.

### Discussion

### I. *Standard of Review*

The proper standard for entry of summary judgment is well known. Federal Rule of Civil Procedure 56(c) provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.* The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To meet this burden, the moving party may rely upon any of the evidentiary sources listed in Rule 56(c) or may rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury. Street v. J.C. Bradford & Co., 886 F.2d

11

1472, 1478 (6th Cir. 1989). Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue. Id.

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). "The mere presence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. Summary judgment is properly granted if the party who would bear the ultimate burden of proof at trial fails to establish an essential element of the claim. See Tolton v. American Biodyne, Inc., 48 F.3d 937, 941 (6th Cir. 1995). If the evidence is insufficient to reasonably support a jury verdict in the nonmoving party's favor, the motion for summary judgment will be granted. Street, 886 F.2d at 1477. With this standard in mind, the Court turns to the parties' motion presentations.

## II.   *Plaintiffs' Claims Against Meadowview, and Meadowview's Request for Declaratory Judgment*

Defendant Meadowview seeks summary judgment on its request for a judgment declaring it lawfully terminated the 2002 MAS-Meadowview contract, and summary judgment on Plaintiffs' five claims against it.

### **Breach of Contract**

A breach of contract "is the commission of an act, or the omission of some act, specified or implied in the contract." Dulworth v. Hyman, 246 S.W.2d 993, 995 (Ky. 1952). Meadowview contends there is no genuine issue of material fact as to whether it breached any of the professional service agreements between it and MAS. It argues the 2000 and

12

2001 contracts expired on their own terms and so could not have been wrongly terminated. The applicable provision of the 2000 PSA calls for a one-year term expiring December 31, 2000. The 2001 was also for a definite duration of one year, by its terms expiring on December 31, 2001.

Meadowview notes that for the 2000 and 2001 contracts, the only provisions identified by Manchikes as being breached were sections related to termination rights and notice of termination. However, these agreements expired by their own terms and none of the provisions Manchikes cites were ever invoked.

Manchikes argues the 2000 and 2001 were "breached" because the background section called for Meadowview to "retain" MAS as the provider, yet (1) Courtney met with Risenmay in December, 2000 to allegedly offer him the contract, and (2) Meadowview failed to provide financial assistance to MAS. However, even if those actions occurred, they do not constitute a "breach." Meadowview did retain MAS as its anesthesia provider in both 2000 and 2001, so even if the meeting with Risenmay is characterized as Plaintiffs' claim, the hospital did not breach "retaining" MAS as the provider for these two contract periods. Any meeting could not be a breach of the 2001 agreement, because any December, 2000 meeting took place before the 2001 agreement took effect by Meadowview "retaining" MAS as provider.

Nor can the refusal to provide financial assistance serve as a breach of either the 2000 or 2001 agreements, including the general "retention" provision, because no provision of these contracts required Meadowview to come to the aid of MAS. In fact, Manchikes admits the requests for assistance were proposed amendments to the contracts. Morever, financial assistance in the form of a loan was offered to MAS, but rejected by Plaintiffs.

13

Plaintiffs also allege the hospital breached the 2000 and 2001 contracts by interfering with MAS's ability to provide efficient anesthesia services by insisting on terms for Risenmay's employment, and by interfering with MAS deciding how to provide services by writing to the Governor in support of allowing CRNAs to practice without a medical doctor's supervision. Meadowview says even if these contentions were accepted as true, they do not constitute a breach because MAS did, in fact, provide services and performed under the 2000 and 2001 contracts.

As explained by Meadowview, the terms of Risenmay's employment were set by MAS, not Meadowview, and were determined and signed off on by Risenmay and MAS before the 2000 contract was signed. Thus, "insistence" upon any terms for Risenmay could not have interfered because these terms were already negotiated, known and agreed to by MAS prior to it executing the 2000 contract with Meadowview. Once MAS was formed, Plaintiffs cannot point out any involvement of Meadowview in Risenmay's employment relationship with MAS. Morever, it was only Risenmay's 2000 contract that permitted him to share in MAS's collections. Risenmay's 2001 contract eliminated this and made him straight salary. Additionally, the legislative change for supervision of CRNAs did not come to pass and therefore had no impact on the parties' performing their obligations under the contracts.

As for the 2002 contract, no specific provision breached has been identified. Plaintiffs maintain simply that this contract was void because in actuality there was no service provider agreement between MACCS and Meadowview; and because the terms of this 2002 contract were unreasonable. First, Meadowview submits the consequence of this is that if it was void, there can be no breach of a void contract, so that claim fails. One

14

cannot sue for breach of a void agreement. Instead, the service contract would be terminable at will. And the contract is not void due to a mere misnomer of a contracting party. Second, as for the 2002 contract being void as "unreasonable," Meadowview correctly notes that unreasonableness in the sense of a bad bargain does not render a contract void; rather unconscionability is required. Forsythe v. Bancboston Mtg. Corp., 135 F.3d 1069, 1074 (6th Cir. 1997)(applying Kentucky law). Unconscionability is a circumstance rarely seen in contract law, id., and is not alleged nor demonstrated here by Plaintiffs. The contract was signed by Manchikes and is not void merely because Manchikes in hindsight believes he made a bad bargain.

The Court concludes the 2002 contract was not void because of misidentification of one of the parties thereto, because this error was not material to the agreement. See Williams v. Ben Williamson & Co., 79 S.W.2d 194, 195 (Ky. 1935). The entity listed was so listed because that was the name provided by Manchikes. Manchikes signed the contract as president of MACCS, making no clarification. MACCS apparently is also the successor corporation to MAS. The contract was for professional services to be performed by him personally, and in conjunction with others. He accepted payment under the terms of that document until it was terminated pursuant its provisions. Any error in name on the documents themselves was an error known to him and from which he cannot now seek to avoid the contract.

Nor is there a genuine issue of fact as to whether the material terms of this 2002 contract were breached by Meadowview. In sum, Meadowview seeks and is entitled to a judgment declaring that it acted properly and within the bounds of the 2002 contract, which

15

was valid and in force between the parties, when it provided notice of termination and thereafter terminated that contract.

### Good Faith and Fair Dealing

Parties have a duty in carrying out a contract to act in good faith, sincerely and without deceit or fraud. Pearman v. West Point Nat'l Bank, 887 S.W.2d 366, 368 & n.3 (Ky. Ct. App. 1994). This is generally observed as the covenant of good faith and fair dealing that is implied in every contract. Ranier v. Mount Sterling National Bank, 812 S.W.2d 154, 156 (Ky. 1991).

Here, Plaintiffs allege the hospital did not act in good faith during the various contracts, evidenced by: (1) the December, 2000 Courtney-Risenmay meeting where Risenmay was allegedly offered the anesthesia contract; (2) refusing to provide Manchikes/MAS with the form of financial assistance sought, instead of offering it only a loan; (3) requiring MAS to compensate Risenmay at above-market rates which made it difficult for MAS to pay for the cost of temporary CRNAs; (4) Loving's presentation of a contract proposal in 2001 that failed to contain terms Manchikes wanted; and (5) drafting the 2002 contract with the MACCS as the contracting party when Manchikes had informed he had decided not to leave MAS. For the reasons stated below, the Court agrees with Meadowview that these particularized incidents do not evidence a breach of good faith or fair dealing.

There is no evidence upon which to create a factual dispute that Risenmay was in fact offered the contract by Courtney. It is undisputed that Meadowview, through Courtney, continued to transact business with MAS for 2001, even though within its rights to seek services elsewhere to commence with the expiration of the 2000 contract. The request for

16

financial assistance, on the terms demanded by Manchikes, is nothing more than an offer to renegotiate, modify, or amend the terms of the existing contract. While parties to a contract can voluntarily do so, it is not a breach of good faith to refuse to accept terms one is under no legal obligation to accept in the first place. Offering the loan in summer 2001 was sufficient, as Meadowview had no contractual or other legal obligation to assist MAS in figuring out how to maximize its profit or to assist Manchikes in achieving whatever salary he sought for himself.

As for Plaintiffs' assertions that Meadowview interfered and acted in bad faith by demanding certain compensation for Risenmay, even accepting this as true, it was not a breach of the hospital's duty of good faith and fair dealing. Rather, it would have been done openly, with full knowledge and awareness by Manchikes of the compensation demands, which salary was still ultimately determined by MAS. To the extent Risenmay's compensation allegedly impacted financial operations, this is mere conjecture rather than fact by Plaintiff. The proof from MAS's consultant Barr is that other issues affected MAS's overall cash flow; namely use of temporary CRNAs, and not Risenmay's initial compensation scheme. On the name issue, the only evidence is that this was simply a clerical mistake and immaterial to the parties' intentions to contract. Manchikes contends this evidences breach of good faith because Meadowview was going to use this mistake to rescind the contract. This speculation is not grounded in fact, shown by the fact Meadowview never questioned the validity of the 2002 agreement upon this or any other basis. Confusion between the parties as to the correct corporate entity does not give rise to a lack of good faith.

17

**Fraudulent Inducement**

A claim of fraudulent inducement requires proof, by clear and convincing evidence, of: a material representation, which is false, known to be false or made recklessly, made with inducement to be acted upon, acted in reliance thereon, and causing injury. Wahba v. Don Corlett Motors, Inc., 573 S.W.2d 357, 359 (Ky. Ct. App. 1978); Brooks v. United Kentucky Bank, 659 S.W.2d 213, 216 (Ky. Ct. App. 1983).

For this claim, Plaintiffs rely upon Courtney's representations as to the income potential in outsourcing, the hospital's intentions to forego employing physicians, and the hospital's goal of increasing surgery cases. Meadowview submits Manchikes cannot show these statements are false. Merely pointing to the fact that expectations for the program were not realized is not clear and convincing evidence that when the statements were made, they were known to be false or made recklessly.

Meadowview submits that the totality of the circumstances, as conceded by Manchikes, works against any good faith argument of fraud in the inducement. Specifically, that Manchikes approached Meadowview about outsourcing; he was fully aware the hospital wanted its long-time anesthesia provider Risenmay to have stability and protection if such an arrangement were done; Manchikes had his own legal counsel in creating MAS and initial dealings with Risenmay; he understood and agreed to Risenmay's initial compensation formula to receive a portion of revenue for services provided; Manchikes had and relied upon an assessment of MAS' income potential prepared by his accountant and business advisor prior to entering into the first contract; and Manchikes' own income under the contract exceeded his prior salary with Meadowview. For these

18

reasons Meadowview is entitled to summary judgment on Plaintiffs' claims of fraudulent inducement.

One final matter on this claim deserves brief comment.  Plaintiffs argue that by not moving for summary judgment on Plaintiffs' tortuous interference claim, Meadowview has conceded that tortuous interference has occurred.  The Court disagrees.  Plaintiffs have not brought a claim for tortuous interference against Meadowview.  Even if Plaintiffs had brought such a claim, such a claim would fail as a matter of law because one cannot interfere with one's own contract.  See, CMI, Inc. v. Intoximeters, Inc. 918 F.Supp. 1068, 1080 (W.D. Ky 1995).

### Defamation

Under Kentucky law, a claim of defamation requires proof of (1) a defamatory statement (2) about the plaintiff (3) that is published and (4) that causes injury to reputation. Columbia Sussex Corp. v. Hay, 627 S.W.2d 270, 273 (Ky. Ct. App. 1982). The Kentucky Court of Appeals recently provided an overview of Kentucky's defamation law helpful to the analysis here.  Poole v. Dollar General Corp., Inc., 2005 WL 2323238 (Ky. Ct. App.)(unpublished decision).  Although Poole is an unpublished case, the court's summary and prior authorities therefor are sound.

> "Defamatory language" is broadly construed as language that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). See also Ball v. E.W. Scripps Co., 801 S.W.2d 684, 688 (Ky. 1990), and McCall v. Courier-Journal & Louisville Times Co., 623 S.W.2d 882 (Ky. 1981). "It is for the jury to determine, on the basis of competent evidence, whether a defamatory meaning was attributed to it by those who received the communication. The terms should be construed in their most natural meaning and should be 'measured by the natural and probable effect on the mind of the average [person].'" Yancey v. Hamilton, 786 S.W.2d 854, 858 (Ky. 1989)(quoting

19

*McCall,* 623 S.W.2d at 884). "[W]ords falsely spoken will be defined according to their popular meaning, and as intended to be meant by the speaker and understood by the hearers. And, in arriving at the sense in which the defamatory language is employed, it is proper to consider the circumstances surrounding its publication and the entire language used." *Abbott v. Vinson,* 230 Ky. 786, 20 S.W.2d 995, 996 (1929).   "It is a fundamental principle in the law of libel and slander that the defamatory matter complained of should be construed as a whole, and that the language employed therein should receive its common and ordinary acceptation in the light of the conditions and circumstances under which it was published." *Commercial Tribune Pub. Co. v. Haines,* 228 Ky. 483, 15 S.W.2d 306, 307 (1929).

Poole, 2005 WL 2323238, at *2.

Plaintiffs assert a defamation claim on behalf of Manchikes individually as well as the corporation MAS.  As Meadowview notes, in order for a corporation to be defamed, it must show that the alleged defamatory matter tends to prejudice it in the conduct of its business. Restatement (Second) of Torts § 561.  However, "[a] corporation is not defamed by communications defamatory of its officers, agents or stockholders unless they also reflect discredit upon the method by which the corporation conducts its business." Id. cmt. b.

According to Plaintiffs, the following defamatory statements were made against Manchikes and/or MAS:

- Courtney's statement to Risenmay in December, 2000 that Manchikes was one drink away from a drunk;"

- Loving's statements in March, 2002 about Meadowview's relationship with MAS, behavioral issues and problems with MAS, employees, and statements that Manchikes reputation preceded him and his problems recruiting CRNAs;

- Loving's alleged statements to recruiter that Manchikes had "cooked the books to screw the hospital;"

- Derogatory statements allegedly made by one Dr. Pierce; and

20

- Statements by hospital worker Belinda Neff questioning co-worker Tom Abbott about Manchikes' physical well-being.

As for Courtney's statement to Risenmay in December, 2000 that Manchikes was "one drink away from a drunk," this statement is not defamatory because it was truthful, as Manchikes admits alcoholics refer to themselves as one drink away from a drunk, meaning they cannot take that first drink. Truthful statements are not defaming. See K.R.S. § 411.045. Additionally, a defamation claim on the basis of this statement is barred by Kentucky's one year statute of limitations. See K.R.S. § 413.140(1)(d).

As for the statements made by David Loving at a March 25, 2002, surgery committee about Meadowview's relationship with MAS, Plaintiffs cannot even establish what actual statements were made, even though they deposed Loving. Thus, the Court cannot determine if they were defamatory. Although Plaintiffs identify the general subject of Loving's comments, to wit, there were behavioral issues and problems with MAS employees and recruiting, these general averments are insufficient. At deposition, Plaintiff identified the behavioral issues as a CRNA hired by MAS and let go shortly thereafter for alleged drug use, the number of temporary staff being utilized by MAS, and the anesthesia service as being unstable. However, even accepting all of this information as true and that Plaintiffs would have admissible evidence at trial of these statements, they simply are not actionable as defamatory. Rather, they are either truthful in that they reflect then business conditions at MAS and/or opinion by Loving about the status of MAS's business operations. The employee was, in fact, hired and fired for alleged drug use; there were in fact a number of temporary employees used by MAS, with the word "parade" simply Loving's

21

description of that circumstance; and that MAS's personnel issues could reasonably be truthfully viewed or described as unstable, as was done by Loving.

With regard to statements allegedly made by Loving on March 13, 2002, to a third-party recruiter used by MAS to the effect that Manchikes' reputation preceded him, and that he could not recruit CRNAs nor get a position in Kentucky, these statements, however, fail to support Plaintiffs' defamation claim for a number of reasons. First, Plaintiffs at this summary judgment stage can produce no evidence actually attributing these statements to Meadowview. The statements were allegedly repeated by MAS's third-party recruiter to MAS employee Vicki Abbott. However, Abbott is unable to identify Loving or anyone else as the actual source of these statements to the third-party recruiter. Rather, she simply presumed such. Second, even if evidence were available to establish that Meadowview's employee Loving made the statements, Plaintiffs would still be attempting to admit the statements through Abbott's offer of hearsay testimony of the third-party recruiter's statements. Moreover, statements such as these alleged are in the nature of an expression of Loving's opinion about Manchikes' abilities. See Biber v. Duplicator Sales & Service, Inc., 155 S.W.3d 732, 737 (Ky. Ct. App. 2005) (statement such as "felt like he had been conned by the world's greatest con man" expression of opinion rather than defamatory fact and so entitled to absolute privilege, therefore affirming summary judgment). Third, Plaintiffs would also be prohibited from pursuing a defamation claim based upon the fact the alleged statements occurred prior to the applicable one-year statute of limitations. See K.R.S. § 413.140(1)(d).

Loving's alleged statement to another recruiter that Manchikes had "cooked the books to screw the hospital" which the recruiter then retold to Manchikes does not create

22

a genuine issue of material fact sufficient to deny summary judgment. Plaintiffs have pointed to no admissible evidence that would be offered to prove this statement. Rather, they rely on Manchikes being permitted to offer inadmissable hearsay to present the alleged statements.

Additionally, statements allegedly made by Dr. Pierce that Manchikes is an "asshole," "dickhead" and a "drunk" also do not create a question of fact on whether they are defamatory so as to survive summary judgment. As noted by Meadowview, no proof has been forthcoming that Dr. Pierce is an agent or employee of Meadowview such that the statements can be attributed to Meadowview. Nor are Plaintiffs able to establish the date these comments were made so that action upon them is timely. And while such comments should not be condoned, neither are such otherwise privileged personal opinions legally actionable as defamatory.

Moreover, that hospital employee Belinda Neff questioned co-worker Tom Abbott whether the rumor that Dr. Manchikes had overdosed on drugs and was in a Lexington hospital on a ventilator was true is also not actionable as defamatory. As noted, Kentucky law provides that the circumstances surrounding the publication and the entire language used should be considered, and defined "as intended to be meant by the speaker and understood by the hearers." Abbott, 20 S.W.2d at 996. As such, the clear and reasonable understanding was that the comment by Neff was intended to seek out the truth of the statement, not as representing the situation as true, and was asked out of concern for Plaintiff.

23

### Civil Conspiracy

Conspiracy requires proof of a corrupt agreement between defendants to do an unlawful act by some concerted action. Montgomery v. Milam, 910 S.W.2d 237, 239 (Ky. 1995); McDonald v. Goodman, 239 S.W.2d 97 (Ky. 1951). Kentucky law provides that a civil conspiracy "may be shown by circumstantial evidence, by the acts or declarations of the conspirators, or by the cumulative effect of concerted action of the several parties concerned." Addison v. Wilson, 37 S.W.2d 7, 11 (Ky. 1931).

Thus, Plaintiffs must present evidence to create genuine issues of material fact on the existence of a corrupt agreement between Meadowview and Risenmay to accomplish an unlawful purpose by taking concerted action. While Plaintiffs *speculate* and *theorize* about such, at this stage of the proceedings, they must be able to point to admissible evidence that creates a jury question on whether there was a conspiracy. Plaintiffs have not satisfied their burden to survive summary judgment on this claim.

Plaintiffs maintain that Defendants conspired with the purpose of terminating MAS's service contract with the hospital, evidenced by Risenmay's December, 2000 meeting with Courtney. Manchikes can point to no evidence of such. Courtney testified the purpose of this meeting was to gauge how Risenmay's working relationship was with Manchikes and to get a sense for how MAS was doing overall, for the specific purpose of determining whether Meadowview wanted to do business with MAS for another year. While Manchikes personally believes differently, he points to no evidence otherwise. Thus, there was nothing corrupt about the discussion, nor evidence of an improper or unlawful purpose to be accomplished since Meadowview (and Manchikes and MAS for that matter) were free to choose another entity with which to contract for services at the expiration of their 2000

24

contract. Moreover, since the 2000 contract was, in fact, ultimately renewed by Meadowview, Plaintiffs can point to no actual damages suffered by the alleged acts Risenmay and Courtney conspired to accomplish. See Davenport's Adm'x v. Crummies Creek Coal Co., 184 S.W.2d 887, 888 (Ky. 1945)(damages must result from actions taken in furtherance of conspiracy). Finally, any action for an alleged civil conspiracy whose purpose was to end the MAS-Meadowview services relationship in 2000 would be barred by the applicable one-year limitations provision of K.R.S. § 413.140(1)(c).

Basically, Plaintiffs rely upon and simply point to the fact that various encounters and communications occurred as giving rise to an inference something underhanded was occurring against Plaintiffs. This is woefully deficient for purposes of surviving a post-discovery summary judgment motion. The various incidents themselves do not suggest, let alone evidence, concerted acts, nor does viewing them in their totality give rise to such an inference. Though Risenmay may have been voicing complaints to Meadowview physicians and administrators in September 2001 and February 2002 about his difficulties working with Manchikes, this does not evidence a conspiracy and is consistent with the decline between the two men. Meadowview's termination of its contract with MAS in March 2002 was within the terms of the contract, with no unlawful subterfuge evidenced by the fact that Loving asked Manchikes if he would release Risenmay from his non-compete. Risenmay's employment relationship with MAS and Manchikes had also ended at this time, Risenmay had previously worked for Meadowview for many years, and a prospective employer inquiring whether a non-compete would be waived before hiring a potential employee is good business judgment, not a conspiracy.

25

Simply put, to survive summary judgment on this claim, there must be something more offered by Plaintiffs than simply their belief as to what occurred. Plaintiffs argue the unlawful act was to deprive Manchikes of his ADA rights and to elevate Risenmay. But again, this is sheer conjecture. Plaintiffs do not identify what "ADA" rights were at issue here, how any such rights would be "deprived" Manchikes, nor did Manchikes bring a separate claim for an ADA violation. While a jury is permitted to make inferences, those inferences must be reasonable ones grounded in *evidence;* a claim of civil conspiracy cannot "rest entirely on vague generalizations with no specific proof." Burklow v. Baskin-Robbins USA, Co., 274 F.Supp. 2d 899, 908 (W.D. Ky. 2003). This claim fails to survive a summary judgment challenge.

### III.    *Plaintiffs' Claims Against Defendant Risenmay*

Plaintiffs seek partial summary judgment on their claim against Defendant Risenmay for breach of fiduciary duty. Defendant Risenmay seeks summary judgment on all claims asserted against him by Plaintiffs; that is, contractual interference, defamation, and conspiracy, in addition to the claim for breach of fiduciary duty to MAS.

### Fraudulent Inducement / Tortious Contractual Interference

With respect to this claim, Risenmay argues that the record is devoid of any evidence suggesting he in any way fraudulently induced Manchikes to enter into the initial 2000 outsourcing contract with Meadowview. Risenmay submits the circumstance was and the record reflects the opposite; that is, Risenmay was hesitant about leaving and having Manchikes replace the hospital as his boss, while Manchikes was enthusiastic about leaving to form his own corporation and contract with the hospital.

26

Plaintiffs, in response, clarify they do not dispute or challenge Risenmay induced Manchikes to leave Meadowview and contract with it via MAS. Instead, Plaintiffs submit their tortious interference challenge goes to Risenmay's efforts to interfere with the contracts for services between Meadowview and MAS. Plaintiffs maintain he sought "to undermine both MAS and Manchikes with Meadowview, with the view that once the contract was either not renewed or terminated, his option to purchase could be exercised and he could then run the anesthesia services at Meadowview." (Doc. #57, p.5) However, Risenmay believes the evidence of any improper conduct of a malicious or tortious nature by him for the purpose of interfering with the MAS-Meadowview contract relationship is simply not there. The Court agrees.

Kentucky law directs courts to consider various factors in considering whether improper or tortious interference with contract has occurred. These include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interest sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. East Kentucky Resources v. Arnett, 892 S.W.2d 617, 619 (Ky. Ct. App. 1995). The various incidents involving Risenmay that are offered by Plaintiffs do not, under these factors, provide reasonable question whether tortious interference by Risenmay with MAS's contractual relationship with Meadowview occurred.

For example, Plaintiffs point to the December 2000 meeting of Courtney and Risenmay. As previously discussed, the only specific evidence about this meeting was that testified to by Courtney, one of its participants. He indicated the purpose of this meeting

27

was to determine how business operations for MAS were working, to inquire about the rumor of problems between Manchikes and Risenmay, and if the rumor that Risenmay had contacted a recruiter and was considering leaving was true. The meeting was arranged by Courtney, after he had been unsuccessful in reaching Manchikes. While Plaintiffs criticize the delay in doing so, it does not negate the fact that Risenmay informed Manchikes of this meeting. Meadowview's inquiries were for purposes of determining whether it desired to enter into future contracts with MAS, and in point of fact it did. Plaintiffs point to no actual evidence that Risenmay sought to obtain that 2001 contract for himself.

Similarly, when Risenmay met briefly with Loving in the fall of 2001, the record evidences, via Loving's testimony, that the purpose was not a tortious one. Risenmay had just had a new employment contract imposed upon him by Plaintiffs, and was seeking clarification of his own situation by asking about his own status at Meadowview if the Meadowview-MAS provider agreement was not renewed for 2002. That contract was, in fact, renewed.

Finally, while the record reflects that Risenmay did meet with David Loving on two occasions in early 2002, the record also reflects the purpose of those meetings related to Risenmay's initiation of an official request for hospital review of an incident involving Manchikes. Plaintiffs have no evidence of any other purpose of or statements from that meeting that could even arguably be construed as Risenmay seeking to interfere with the then 2002 services contract between Meadowview and MAS. In addition, and as pointed out by Risenmay, any issues raised by Plaintiffs with respect to Risenmay's failure to use particular equipment or him making offers to other CRNAs for employment with MAS were

28

internal employment issues between Risenmay and MAS/Manchikes. They have no relevancy to the contract for services between Meadowview and MAS.

In summary, even viewing the case in the light most favorable to Plaintiffs, they have presented no evidence that Risenmay did, in fact, tortiously interfere with either an existing Meadowview-MAS contract or the prospect of one. Therefore, summary judgment for Risenmay on this claim is appropriate.

### Defamation

Plaintiffs maintain that Risenmay made various derogatory and defaming statements about Manchikes, which statements also defamed MAS since Manchikes is its President. Plaintiffs rely upon the testimony of Vicki Abbott in support of this claim. They submit Abbott recounted comments Risenmay made to her questioning Manchikes' sanity and sobriety, that he was difficult to get along with, did not know what he was doing, and was crazy. But as discussed above in reviewing Plaintiffs' defamation claim against Meadowview, Kentucky law requires defamatory statement be viewed in context. It also provides for a privilege when the statement represents that of a personal opinion, which was the nature of the Risenmay statements above.

Moreover, Risenmay points out that all of these statements were allegedly made by him (since he notes inconsistencies in the two depositions given by Abbott) before his resignation from MAS. He contends, therefore, that a defamation claim based thereon is barred by Kentucky's one-year limitations statute, since they were made more than one year prior to Plaintiffs' March 20, 2003, filing of their Complaint. In response, Plaintiffs do not challenge the timing of the statements, but rather suggest that Risenmay should be estopped from asserting any statute of limitations defense, given "[t]he continuing nature

29

of the conspiracy, misrepresentations, continual breach of fiduciary duty to MAS and to Manchikes, the tortious interference with contracts with the intent to benefit Risenmay" which serve to estop him from using this defense pursuant to K.R.S. § 413.190(2). However, that statutory section concerns tolling the statute when a defendant has obstructed the prosecution of an action, a circumstance not shown nor argued by Plaintiffs herein. Nor do they cite any authority wherein equitable estoppel has been applied in circumstances analogous to this case. Therefore, in addition to being statements reflecting Risenmay's personal opinions, any action for defamation otherwise available is time-barred pursuant to K.R.S. § 413.140(1)(d).

Risenmay also challenges any claim for "injurious falsehood" that Plaintiffs seek to assert. Risenmay argues Kentucky does not recognize a claim for injurious falsehood. See CMI, Inc. v. Intoximeters, Inc., 918 F.Supp. 1068, 1089 (W.D. Ky. 1995). Plaintiffs have not challenged this argument. Therefore, any purported claim for injurious falsehood identified by Plaintiffs in their Complaint as being asserted against Defendant Risenmay, or against Defendant Meadowview for that matter, is barred as a matter of law.

### Civil Conspiracy

Plaintiffs also asserted a civil conspiracy claim against Risenmay. This claim against Risenmay, and the factual bases in support, is of no greater strength than the civil conspiracy claim asserted against Meadowview, with whom Risenmay allegedly concerted. Indeed, Plaintiffs acknowledge the facts they are able to prove are limited to those that a few meetings occurred between Risenmay and Courtney and/or Loving. They cannot establish why these meetings occurred or what was discussed during them other than as

30

related by the participants. This claim, therefore, will be dismissed for the same reasons previously noted in conjunction with the analysis of the claims against Meadowview.

### Breach of Fiduciary Duty

It is undisputed that Risenmay was both a contractual employee of MAS and an officer (secretary/treasurer). The record reflects, and Risenmay does not dispute, that the working relationship between him and Manchikes deteriorated over time. Plaintiffs submit that Risenmay discussed the formation of a CRNA-only corporation to provide anesthesia services to Meadowview. Indeed, Manchikes testified that Risenmay discussed with him the fact that he wanted to form another company. Risenmay does not and cannot dispute this. The issue, however, is whether this fact constitutes a breach of Risenmay's fiduciary duty to MAS. Based upon the standard under Kentucky law, the Court concludes there is no genuine issue that it does not constitute a breach of fiduciary duty.

By statute, Risenmay had a duty to act in good faith, on an informed basis, and in the best interests of the corporation. See K.R.S. § 271B.8-420. That Risenmay had disagreements with Manchikes, president of MAS, over business operations is certainly not a breach of this duty. If that was the standard, thousands of corporations in Kentucky would be seeking damages under the statute.

Nor is the fact that Risenmay contemplated the possibility of facilitating the formation of a related-services company in violation of Kentucky law. Both sides look to Steelvest, Inc. v. Scansteel, 807 S.W.2d 476 (Ky. 1991) as insightful on Kentucky's standard under common law. In Steelvest, defendant employee/director worked on formulating a plan to start his own competing business then, after completing most of the business formalities, resigned to commence direct competition. Id. at 479. The Steelvest

31

court recognized that with respect to the duty owed by an officer or director to a corporation, "[g]enerally, in the absence of a contractual provision to the contrary, corporation fiduciaries, such as directors or officers, are free to resign and form an enterprise that competes with the corporation after they sever their connection with it." Id. at 483. In Steelvest, the state court concluded that issues of material fact existed as to whether defendant breached this duty so as to prevent summary judgment under the state-law standard. Id. at 484. In this regard, the court expressly noted that the record facts

> disclose that [defendant], while still employed with Steelvest, made certain plans, arrangements, and preparations for setting up his own business to compete with Steelvest. He sought legal and accounting advice, made active efforts to acquire bank financing, and recruited investors, two of whom, coincidentally, were chief executive officers of major customers of Steelvest. [Defendant] failed to disclose such activities to any representative of Steelvest. There is also some evidence of record that prior to his resignation from Steelvest, [defendant] indicated to prospective investors and to bank personnel that he would bring with him some of the present employees of Steelvest.... Therefore, we cannot conclude that there are no genuine issues of material fact in this case respecting [defendant's] alleged breach of fiduciary duty[.]

Id. The factual circumstances herein pertaining to Risenmay's desire to form his own professional service corporation, even viewed in the light most favorable to Plaintiffs, fail to reveal formation efforts anywhere close to those undertaken by the defendant in Steelvest. At most, Risenmay made general inquiries, with no evidence of any actual affirmative steps to set up the corporation, obtain financing, et cetera. And Risenmay openly voiced his thoughts on the subject, unlike the defendant's concealment in Steelvest. On balance, under the federal summary judgment standard, no genuine issues of fact material to determining whether Risenmay breached his fiduciary duty to MAS have been shown by Plaintiffs.

32

**Punitive Damages**

One last point with respect to Plaintiffs claims. Plaintiffs have identified as a separate claim in their Complaint a request for punitive damages from Defendants. Given the Courts' conclusion that summary judgment in Defendants' favor on all of Plaintiffs' claims against them is in order, Plaintiffs' claim for punitive damages cannot be supported and therefore is also denied.

## IV.     *Defendant Risenmay's Counterclaims*

As previously noted, Defendant Risenmay asserts various claims by way of counterclaim. He has not moved for summary judgment thereon, though Plaintiffs submit that they are entitled to summary judgment dismissing these claims.

Perhaps most notable in reviewing the quality of proof on these claims post-discovery is that, due to his condition, Risenmay is personally unable to offer his own direct testimony in support of his claims. Given this fact, Risenmay voluntarily agrees to dismiss his claims for defamation and intentional infliction of emotional distress.

Risenmay, however, continues to assert counterclaims against Plaintiffs for tortious and fraudulent termination of his then-existing employment contract with MAS and inducement to enter into the new employment contract when Manchikes in the fall of 2001 unilaterally modified Risenmay's employment contract and required him to accept it in order to continue working for MAS. Risenmay further asserts that Plaintiffs breached both his original contract and the "fraudulently induced" September, 2001 contract by failing to pay him various compensation and expenses he maintains were incurred and subject to reimbursement thereunder. Finally, Risenmay countersues Manchikes for breach of fiduciary duty.

33

In seeking summary judgment on Risenmay's remaining claims against them, Plaintiffs point to and rely upon a March 2002 document executed by Risenmay and Manchikes when Risenmay announced his resignation. Specifically, that document, entitled "Agreement for Termination of Employment of Allan K. Risenmay and Termination of Option Agreement," contains an express release.

> The parties release and forever discharge the other from any and all claims, right, obligations, benefits and privileges of any kind or character, accounts, proceedings, liabilities suits causes of action, debts, rights, agreements, promises, losses, damages, costs, expenses, controversies in law and equity arising out of the Employment Agreement and Risenmay releases and relinquishes to the Corporation and its successors, all his right, title and interest in said corporation transferred hereunder, except as otherwise provided herein.

¶ 3.2. Plaintiffs maintain that this release document prohibits Risenmay's pursuit of his counterclaims against them.

In response, Risenmay challenges Plaintiffs' legal ability to seek to enforce this release agreement against him, given that Plaintiffs' themselves responded to Risenmay's termination of his relationship by the filing of this lawsuit. Given this fact, argues Risenmay, Plaintiffs must believe the release is ambiguous else they could not have sued Risenmay. In other words, "[e]ither the agreement is valid and binding upon both parties or it is invalid and not binding upon either party." (Doc. #55, p.5)

The Court agrees. This document was, in fact, prepared by Risenmay's counsel. The intention of the parties to participate in a mutual release as they severed their professional relationship is clear and unambiguous. Though the Court reviewed the merits of Risenmay's motion for summary judgment, Risenmay is equally as entitled to enforce this release against Plaintiffs as Plaintiffs now seek to enforce it against him.

34

Moreover, this 2002 release agreement precludes any counterclaim by Risenmay with respect to alleged tortious and fraudulent interference of Manchikes in allegedly forcing Risenmay to accept the unilateral modifications in his employment contract with MAS.  In point of fact, Risenmay is not able to offer testimony as to the actual circumstances surrounding his final acceptance of this contract.  It is undisputed that the modification was not accepted "as is," but rather that changes were made by Risenmay.  Moreover, the 2002 release agreement between the parties expressly notes this fact that Risenmay's contract was "unilaterally modified by Lloyd A. Manchikes, director and shareholder, without notice to the Board of Directors, nor action by the Board of Directors" as one of the reasons leading to not just the termination of their business relationship, but the parties' mutual release of claims.

For all of these reasons, Plaintiffs are entitled to summary judgment on the counterclaims brought by Risenmay against Plaintiffs.

### Conclusion

Wherefore, for the reasons stated herein,

**IT IS ORDERED as follows:**

1.      Defendant Meadowview Regional Medical Center, LLC's Motion for Summary Judgment on its counterclaim for declaratory judgment, as well as summary judgment on each of Plaintiffs' five claims against it (Doc. # 37) be, and is, hereby **granted**;

2.      Defendant Risenmay's Motion for Summary Judgment on the four claims Plaintiffs assert against him (Doc. # 39) be, and is, hereby **granted**;

35

3.      Plaintiffs' Motion for Partial Summary Judgment against Defendant Meadowview on Plaintiffs' breach of contract, inducement and interference, and defamation claims, and seeking dismissal of Meadowview's counterclaim for declaratory judgment (Doc. # 40) be, and is, hereby **denied**;

4.      Plaintiffs' Motion for Partial Summary Judgment against Defendant Risenmay (Doc. # 41), be, and is, hereby **denied** on its claims for breach of fiduciary duty; and **granted** as to Risenmay's counterclaims;

5.      Defendant Risenmay's counterclaims against Plaintiffs be, and are, hereby **dismissed with prejudice** ; and

6.      As all claims have been finally adjudicated, the Clerk is directed to **strike the matter** from the docket of the Court.

This is a final and appealable Order.

This 31st day of March, 2006.



Signed By:
David L. Bunning
United States District Judge

DAVID L. BUNNING, JUDGE
UNITED STATES DISTRICT COURT

G:\DATA\Opinions\2-3-79-Opinion&Order.wpd